# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| CJ HOLDING CO., *et al.* | § | |
| | § | |
| Debtors. | § | |
| | § | |
| SHARP IRON GROUP, LLC, | § | |
| | § | CIVIL ACTION NO. H-18-1974 |
| Appellant, | § | |
| | § | |
| v. | § | |
| | § | |
| TOTAL E&S, INC., | § | |
| | § | |
| Appellee. | § | |

## MEMORANDUM OPINION AND ORDER

This is an appeal from the bankruptcy court's order sustaining a debtor's objection to a creditor's proof of claim. (Bankruptcy Docket Entry No. 2306). The dispute arose from a sales contract between Total E&S, Inc. and Sharp Iron Group, LLC. In Total's consolidated bankruptcy proceeding, Sharp alleged that Total had breached the contract by refusing to take delivery of, and failing to pay for, goods that Sharp manufactured to Total's specifications, after Total told Sharp to delay shipment indefinitely. (Docket Entry No. 6 at 21–22). Total alleged that it had terminated the contract and was not liable to pay for the goods that were not shipped. (Docket Entry No. 10 at 6–7). Sharp responds that it manufactured the goods before Total terminated the contract, and that Total is obligated to pay for them. The court has appellate jurisdiction under 28 U.S.C. § 157(b)(2)(B), and must decide whether the bankruptcy court erred in finding that Total had terminated the contract and did not breach it by refusing to accept shipment or pay.

The question is a close one, and the bankruptcy judge was both careful and thorough. But

after considering the parties' briefs, the record, and the applicable law, the court finds that the record is inadequate to conclude that Sharp has no claim for relief. Because factual disputes material to determining Total's liability remain, this court reverses the bankruptcy court's decision and remands. The reasons are stated in detail below.

**I.     Background**

The bankruptcy judge held an evidentiary hearing. Sharp's CEO and owner, Michael Stanford, and its president, James Frank, testified. In 2013, Total entered into two purchase orders with Sharp to manufacture T-2600 power frames to meet Total's design specifications. (Docket Entry No. 6 at 1). Total drafted the purchase orders. They required Sharp to deliver four to five frames it manufactured, each week from 2014 to 2015. Total agreed to pay $26,000 for each frame. (*Id*. at 10).

Between October and December 2014, Sharp manufactured and shipped 25 frames, and Total paid the amount due. Sharp alleges that Total repeatedly asked it to keep up with the manufacturing schedule. Beginning in August 2014, Sharp hired over two dozen new employees and made other expenditures to increase its manufacturing capacity. It is unclear that Sharp told Total that it was making this additional investment to timely fill the purchase orders.

Starting on December 1, 2014, Total asked Sharp to slow down the shipments and deliveries. The parties agreed to a revised delivery schedule on December 15, reducing the shipments to three frames per week. (Docket Entry No. 2, at 1242–44). Under this revised schedule, Total accepted and paid for another five frames. On January 19, 2015, Tiffany Sprong, Total's buyer representative, emailed her counterpart at Sharp, Roger DeVilbiss, stating that Sharp needed to reduce its deliveries "down from three to two per week and cannot accept early delivery of any

2

frames." (*Id*. at 1461). By this time, Sharp had begun manufacturing 18 frames.

On January 24, Sprong emailed DeVilbiss, telling Sharp to stop all shipments until further notice. Sharp did not respond. (*Id*. at 1462). On February 15, Sprong sent DeVilbiss another email, stating that "[t]here are 32 frames sitting on [Total's] floor. I [am] hoping I can take delivery of a frame or two in a couple weeks." (*Id.* at 1463). At this time, Sharp was finishing 20 frames that had been in the production process since January. Between January and May 2015, Sharp continued finishing those frames. (*Id*. at 1247–48).

According to Sharp, Total's January email asked Sharp to delay shipments, but not to stop production. Sharp had the impression that Total had slowed delivery, but that it did not intend to terminate the purchase orders. (*Id.* at 1250). Total had some internal documents about terminating the purchase orders, but the internal emails of Sharp's sales representative and president, and their communications with Total, do not suggest that they knew Total was considering termination. (*Id.* at 1253).

On April 17, Sprong again emailed DeVilbiss. This email stated: "[b]ased on all the meetings that I've been in and the latest directive from Executive Management, we won't be able to take delivery of frames any time in the near future. I wish we had better news and hope to see improvement soon. But as of today, that's the position we're in." (*Id*. at 1472).

In May 2015, DeVilbiss asked Sprong about Total's frame inventory. Sprong responded that Total still had 31 unused frames. (*Id*. at 1470). According to Sharp, from May to August, DeVilbiss frequently emailed Total and asked about the existing inventory and for a revised delivery schedule. (*Id*. at 1253–55).

On August 19, 2015, the parties conferred at Total's office in Granbury, Texas. Stanford,

3

DeVilbiss, and Sharp's president, James Frank, met with Total's vice-president, Kevin Barnes. (Docket Entry No. 6 at 16). The Sharp officers presented Barnes with a proposed new delivery schedule. (*Id.*). Barnes objected, and the parties did not reach an agreement. According to Sharp, Barnes still did not ask Sharp to stop production or suggest that Total intended to terminate the orders. Instead, Barnes talked about Total's plan for increased business in the third and fourth quarters of 2015. (Docket Entry No. 2 at 1256).

By August 2015, Sharp had 20 finished frames ready to deliver. In September 2015, Sharp's warehouse operations manager, Craig Gillentine, emailed Barnes, stating that beginning on September 15, Sharp would begin charging Total a $25 monthly storage fee for the completed frames. (*Id,* at 1258).

On October 7, DeVilbiss emailed Kevin Barnes, asking for more details about Total's fourth-quarter plans. (*Id.* at 1259). On November 17, Barnes emailed Frank, stating that there was "still no change. We're not in a position to take any frames but remain hopeful that business will return soon." Barnes also told Frank that Sharp was on Barnes's "calendar for contact first week in December to touch base," and that Total was "on plan December 11, 2015." (*Id.* at 1265).

On December 17, Frank followed up on Barnes's November email by asking Barnes about Total's plans. On December 29, 2015, the parties held a conference call. According to Stanford, Total indicated that it still intended to take the frames, sometime in the future. Frank testified that throughout 2015, Sharp had "requested, begged, pleaded, put [its] own plan together, were promised a plan, were promised [the frames] would get bought." (*Id*. at 1310). Frank testified that Sharp notified Total repeatedly that it was working on, and had finished, 20 frames. (*Id*.).

On December 29, 2015, Sharp sued Total in Texas state court, alleging breach of contract.

4

(Docket Entry No 6). On January 18, 2016, Total emailed Sharp a letter, stating as follows:

> We deny the allegations set forth in the Lawsuit and look forward to defending against them. It is our contention that we previously provided notice to Sharp . . . of our cancellation of the relevant Agreement and Purchase Orders and repeatedly made clear that we were not in a position to take further delivery of products from Sharp. In the interest of clarity, and for the avoidance of doubt, we again reiterate that any and all Agreements and Purchase Orders, including Purchase Orders 0799778 and 082139, are terminated and canceled as to any and all products for which Total . . . had not already accepted and taken delivery."

(Docket Entry No. 10 at 15).

After receiving this notice of cancellation and termination, Sharp tried to mitigate its damages by selling the frames. Sharp had difficulty reselling them because they were custom-made to Total's specifications. Sharp had sold only six by April 2018, at a lower price than the purchase-order price Total had agreed to pay. Sharp could not sell 14 of the 20 completed frames. (Docket Entry No. 2 at 1273–74).

The parties dispute when Total exercised its termination right to cancel the two purchase orders. Sharp alleges that before January 2016, Total provided no written notice of cancellation. (Docket Entry No. 6 at 13). Stanford testified that as of January 18, the date Total gave written notice of termination, the parties were bound by the purchase orders. (Docket Entry No. 2 at 1286). Frank testified that he was familiar with the oil and gas industry and had never before encountered a customer who refused to pay for a completed product. (*Id*. at 1308)

In July 2016, Total filed for voluntary bankruptcy under Chapter 11. (Docket Entry No. 10 at 17). Sharp filed a proof of claim against Total based on its breach-of-contract cause of action. Total objected to the proof of claim. In April 2018, the parties appeared at an evidentiary hearing. Ruling from the bench, the bankruptcy court found that Total had terminated the purchase orders and did not breach by failing to pay for the 20 completed, unshipped frames. The court sustained

5

Total's objection to the proof of claim, and Sharp appealed. Indian Creek Fabricators, Inc., a similarly situated creditor, filed an amicus curiae brief supporting Sharp. (Docket Entry No. 9).

The parties' dispute focuses on two questions: (1) whether Total breached by refusing to take possession of, or pay for, the 20 frames that Sharp manufactured and tendered for delivery before Total's written termination notice; and (2) if Total did breach, whether it was nevertheless not liable and owed no damages because the purchase orders gave Total the unilateral right to terminate at any time.

## II. The Legal Standard

"[T]raditional appellate standards" apply to a district court's review on an appeal from a bankruptcy court's judgment or order under 28 U.S.C. § 158(a). *Stern v. Marshall*, 564 U.S. 462, 475 (2011). This court reviews the bankruptcy court's conclusions of law *de novo* and findings of fact for clear error. *See, e.g.*, *In re Ahern Enters., Inc.*, 507 F.3d 817, 820 (5th Cir. 2007). "A finding is clearly erroneous if it is without substantial evidence to support it, the court misinterpreted the effect of the evidence, or [the] court is convinced that the findings are against the preponderance of credible testimony." *Bd. of Trs. New Orleans Emp'rs Int'l Longshoremen's Ass'n, AFL–CIO Pension Fund v. Gabriel, Roeder, Smith & Co.*, 529 F.3d 506, 509 (5th Cir. 2008).

Whether a party has breached a contract and its proper interpretation are questions of law. *X. Techs., Inc. v. Marvin Test Sys.*, 719 F.3d 406, 413 (5th Cir. 2013); *Fina, Inc. v. ARCO*, 200 F.3d 266, 268 (5th Cir. 2000). Total and Sharp agree that Texas law applies. (Docket Entry No. 11 at 2); *Century Sur. Co. v. Seidel*, 893 F.3d 328, 332 (5th Cir. 2018). In construing a contract, a court must ascertain and give effect to the written expression of the parties' intent. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011); *Seagull Energy E&P,*

*Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006). Courts "strive to honor the parties' agreement and not remake their contract by reading additional provisions into it." *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010). The parties' intent is governed by what is written in the contract, not by what one side contends they intended but failed to say. *Id.* at 127. "[I]t is objective, not subjective, intent that controls." *Matagorda Cty. Hosp. Dist. v. Burwell*, 189 S.W.3d 738, 740 (Tex. 2006) (per curiam). The court must give contract terms their plain and ordinary meaning unless the contract indicates that the parties intended differently. *Dynegy Midstream Servs., Ltd. P'ship. v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009). "This reliance on the written terms must include consideration of all the terms: '[C]ourts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless.'" *Frew v. Janek*, 780 F.3d 320, 327–28 (5th Cir. 2015) (quoting *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)). A court does not consider only those parts of a contract that favor one party. *City of Keller v. Wilson*, 168 S.W.3d 802, 811 (Tex. 2005). The court must consider the contract "from a utilitarian standpoint and bear in mind the particular business activity to be served," and, when possible and proper to do so, avoid a construction that is "unreasonable, inequitable, and oppressive." *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (per curiam) (quoting *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)).

If a contract is not ambiguous, the court must enforce it as written without considering parol evidence to create an ambiguity or give the contract "a meaning different from that which its language imports." *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008) (per curiam). A court determines whether a contract is ambiguous by looking to it as a whole, in light of the

7

circumstances present when the parties executed it. *Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981). The contract is unambiguous if it can be given a certain or a definite meaning as a matter of law. *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 806 (Tex. 2012). If the contract is subject to more than one reasonable interpretation after applying the pertinent rules of contract construction, then the contract is ambiguous and a factual dispute material to determining the parties' intent exists. *Id.* (citing *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003)).

## III. Analysis

### A. The Purchase Order Provisions

Three provisions of the parties' two purchase orders are relevant:

**§ 2 Termination or Modification**. Total may, at its option, *terminate* this Agreement and any Purchase Order, in whole or in part, *upon providing written notice* to Seller. Any conforming deliveries made prior to the effective date of such cancellation shall be controlled and governed by this Agreement. Total agrees to pay Seller for such conforming deliveries in accordance with the applicable Purchase Order. In the event, however, that Seller is in breach of any of the terms thereof, including the warranties of the Seller, or in the event that Seller so fails to make progress so as to endanger performance by Seller of the Purchase Order in accordance with its terms or the performance by Total of any order or contract with any other party, Total shall be entitled to cancel Purchase Order without liability.

**§ 3 Terms of Payment**. Seller shall receive the compensation specified in the Purchase Order; provided, however, that in the event Seller, at any time during the life of the Purchase Order, quotes or sells similar Goods under similar conditions to any other customer at a price lower than that stated in the Purchase Order, such lower price shall, from that time forward, be substituted for the price stated in the Purchase Order. Total shall not be responsible for any additional changes, whatsoever, with respect to any Goods furnished in connection with a Purchase Order unless they are approved in writing by the head of the purchasing department or a corporate officer of Total. Upon request, Seller shall provide to Total an itemized list of Seller's costs. Payment shall be made within forty five (45) days of the *date of delivery*. Any deliveries containing excess Goods shall be returnable at the sole cost and expense of Seller. Any Goods shipped in advance of the scheduled delivery date may be

8

> stored by Total at the expense of Seller or may be returned to Seller at Seller's expense, but if retained, invoices may be paid as of the scheduled delivery date.
>
> **§ 9 Changes**. Total reserves the right to make changes in (1) the specification, drawings and sample if any; (2) the method of the shipment or packaging; (3) the place and time of performance; and (4) the articles and materials, including the quantity thereof, to be furnished by the Seller (each a "Change"). If any such Change causes an increase or decrease in the cost of, or the time required for performance of a Purchase Order, an equitable adjustment shall be made in the contract price [or] performance schedule, or both, by mutual agreement. Any request by Seller to adjust the terms of any applicable Purchase Order as a result of a Change must be submitted to Total in writing within thirty (30) days from the date Seller received notice of change.

(Docket Entry No. 10 at 13–14) (emphasis added).

Sharp asks the court to reverse the bankruptcy court's ruling that Total terminated the purchase orders before 2016 by refusing to take any deliveries and did not breach any obligation to receive and pay for frames after that. Sharp argues that Total's obligation to pay was triggered when Sharp "delivered" the 20 frames completed between January and May 2015—before Total gave notice to stop shipment, also before Total sent a written notice terminating the order—by tendering the frames Total for shipment. According to Sharp, Total did not terminate the purchase orders until January 2016, when it set the written notice of termination. Instead, Sharp alleges, until January 2016, Total "repeatedly informed Sharp that it intended and hoped to take delivery in the near future." Sharp alleges that Total is liable for breach because it refused to pay for the 20 completed-and-tendered frames, a liability that survived the January 2016 written notice terminating the purchase orders. (Docket Entry No. 6 at 23–25).

Total responded that the bankruptcy court did not err because: (1) Total exercised its right to put off delivery under § 9; and (2) even if Total did breach, § 2 allowed it to terminate

9

the purchase orders without liability. (Docket Entry No. 10 at 19–20). Total contends that it was not obligated to pay for the 20 frames it did not authorize for shipment and never received, because § 3 requires payment within 45 days of the date of actual delivery, which did not occur.

### B. Total's Right to Make Changes Under § 9

Total conceded that it would have been obligated to pay if it had terminated the Purchase Orders after Sharp delivered the frames. (Docket Entry No. 10 at 27). Sharp argues that it "delivered" the manufactured frames by tendering delivery, which it did by giving Total the notice reasonably needed for it to take delivery and holding the conforming frames at Total's disposition. (Docket Entry No. 6 at 30) (citing *Anadarko Petroleum Corp. v. Williams Alaska Petroleum, Inc.*, 737 F.3d 966, 971 (5th Cir. 2013) ("[W]here [the supplier] has already discharged its full performance under the contract by tendering the oil, [the purchaser]'s obligation to pay the correct contract price . . . is no longer executory and thus survives the contract's termination.")).

Total objects to Sharp's interpretation, arguing that "delivery" under § 3 required actual delivery. Total relies on the fact that the purchase orders did not mention "tender," and that § 9 of the purchase orders gave Total the right to put off delivery indefinitely. (Docket Entry 10 at 14–15). Total distinguished this case from *Anadarko Petroleum*, on the basis that in *Anadarko*, the seller had actually delivered the products. *Anadarko Petroleum*, 737 F.3d 966, 969.

The purchase orders do not define "delivery." The Texas Business and Commerce Code does not define "delivery" and "tender" separately. Sharp relies on § 2.503(a) of the Code, which provides the manner of seller's tender of delivery:

> Tender of delivery requires that the seller put and hold conforming goods at the
> buyer's disposition and give the buyer any notification reasonably necessary to

> enable him to take delivery. The manner, time and place for tender are determined by the agreement and this Article.

TEX. BUS. & COM. CODE § 2.503(a). Sharp argues that Total violated its obligation to use reasonable effort to take physical possession of goods tendered for delivery. *Valeo Mktg. & Supply Co. v. Kalama Int'l*, 51 S.W.3d 345, 352–54 (Tex. App.—Houston [1st Dist.] 2001, no pet.).

The bankruptcy court did not rule on a specific interpretation of "delivery" under § 3 of the purchase orders, and it is not necessary for this court to do so.

Total contends that it exercised its right under the purchase orders to change the performance terms. (Docket Entry No. 10 at 12). The first sentence in § 9 allows Total to make changes in "the place and time of performance" and "the articles and materials, including the quantity . . . to be furnished." Nothing in the purchase orders limited Total's right to reduce the number of frames it would accept or to defer shipments; both modifications would be "Changes."

The next sentence in § 9 states that "[i]f any such Change causes an increase or decrease in the cost of, or the time required for performance of a Purchase Order, an equitable adjustment shall be made in the contract price [or] performance schedule, or both, by mutual agreement. Any request by Seller to adjust the terms of any applicable Purchase Order as a result of a Change must be submitted to Total in writing within thirty (30) days from the date Seller received notice of the change." The word "shall" is inherently ambiguous; depending on context, it can mean "must," "should," or "may." BRYAN A. GARNER, GARNER'S DICTIONARY OF LEGAL USAGE 952–55 (3rd ed. 2011); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 112–15 (2012). It could mean that the parties "must" make an equitable adjustment to the contract price or time for performance if the delay in shipment or reduction in the number of frames increased the time for, or cost of, Sharp's performance. But because the sentence qualified "shall"

11

with the requirement that any adjustment be mutually agreed, "shall" is properly read in context to require Total, on Sharp's timely written request, to make good-faith efforts to reach agreement on an equitable adjustment to the time for performance or the purchase price if Sharp timely requested. TEX. BUS. & COM. CODE § 1.203; *El Paso Natural Gas. Co. v. Minco Oil & Gas, Inc.*, 8 S.W.3d 309, 313 (Tex. 1999) (the contracting parties have "a statutory obligation to act in good faith in the performance, enforcement[,] and modification of these agreements"); *Man Indus. (India), Ltd. v. Midcontinent Express Pipeline, LLC*, 407 S.W.3d 342, 363–64 (Tex. App.—Houston [14th Dist.] 2013, pet. denied); *see also Andypolo LP v. Caravan Rug Corp.*, No. H-12-3556, 2014 WL 4273886, at *11–*12 (S.D. Tex. Aug. 28, 2014) (summarizing *El Paso*, which required the parties of a contract to "act fairly and in good faith in the performance, enforcement, and modification of its agreements," but that duty did not apply to "the formation of contract, including releases").

The record shows that Sharp did submit repeated written requests, in the form of emails, to Total, asking for a new shipment schedule, for authorization to ship, and for an adjustment to the price that would include Sharp's storage fees for the frames it had begun manufacturing before Total deferred deliveries and completed before Total sent written notice of terminations. There is at least a factual dispute as to whether Sharp's emails were effective written notice to Total to negotiate in good faith to equitably adjust the contract price or performance schedule, or both. The purchase orders do not state the consequences if the parties fail to reach mutual agreement after Total makes a "Change" and Sharp provides a timely written request to adjust the purchase order terms because Total's changes have increased Sharp's time for, or costs of, performance. The failure creates an ambiguity as to whether Sharp is then entitled to recover for the frames it manufactured in accordance with the purchase orders before Total gave effective notice of its intent to terminate.

That ambiguity is underscored by the testimony and exhibits showing that before it sent the email notice of termination, Total repeatedly told Sharp, in writing and orally, that it hoped to resume taking deliveries "soon," and by the evidence that Total did not state, orally or in writing, before January 2016, that it intended to terminate or cancel the purchase orders.

The current record supports a finding that Sharp reasonably understood Total's statements as meaning that Total would accept shipment of, and pay the Purchase Order price, for the frames Sharp had completed between January and May 2015; that Sharp was ready to deliver these frames as soon as Total authorized shipment; and that Sharp was paying to store the frames in a climate-controlled facility until Total authorized shipment.

Section 2.103 of the Texas Business and Commerce Code defines "good faith" as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." TEX. BUS. & COM. CODE § 2.103. Under Texas law, "[a] promise is illusory if it does not bind the promisor, such as when the promisor retains the option to discontinue performance." *In re 24R, Inc.*, 324 S.W.3d 564, 567 (Tex. 2010); *see also M&G Polymers USA, LLC v. Tackett*, 851 F.3d 473, 481 (5th Cir. 2017) ("If the Policy provides [the defendant] with the unquestionable right to pay only to the extent it pleases, it is illusory."); *cf. In re Halliburton Co.*, 80 S.W.3d 566, 569–70 (Tex. 2002) (an arbitration agreement giving the employer the right to unilaterally terminate was not illusory because the agreement required prior notice of changes, including termination). Reading the purchase orders to give Total the right to unilaterally terminate without any written notice and to escape payment for any frames manufactured before then, in reliance on Total's purchase order commitment to pay for them, could result in an illusory contract. *M&G Polymers USA, LLC v.*

*Tackett*, 135 S. Ct. 926, 936 (2015) (courts should avoid constructions of contracts that would render promises illusory because such promises cannot serve as consideration for a contract).

At trial, Sharp testified that from January to December 2015, it "requested, begged, pleaded" with Total to provide or agree to a revised delivery schedule, and that Total failed to do so, while expressing the intent and hope to take the frames in the near future. Factual disputes that the present record does not resolve include whether Sharp gave Total a timely written request to adjusting the delivery schedule or prices, or both, within 30 days after receiving notice of Total's changes, and whether Total negotiated a price or schedule adjustment in good faith after exercising its § 9 right to make changes in the delivery quantity and schedule that delayed Sharp's performance or increased the price.

### C. Total's Right to Terminate Under § 2

Section 2 of the purchase orders provided Total the right to terminate. Total contends that it is not liable for any breach after it exercised its termination right because it did so before receiving actual delivery of the frames. Sharp argues that Total's liability survived the termination notice. According to Sharp, "terminate" and "cancel" have different meanings in the purchase orders. The last sentence of § 2 states that Total had the right to *cancel* a purchase order if Sharp breached, without liability; while the first sentence states that Total had the right to *terminate* only after providing Sharp written notice. Sharp argues that under § 2, Total could end the purchase orders without liability for manufactured-but-undelivered frames only if Total "cancelled" based on Sharp's breach. If Total unilaterally terminated, rather than cancelled, the purchase orders without a prior material breach by Sharp, Total would, according to Sharp, remain liable to pay at least for the frames Sharp manufactured and tendered for delivery before the termination. (Docket Entry No. 6

at 27). Sharp relied on the Texas Business and Commerce Code for the different definitions of "termination" and "cancellation":

> (c) "Termination" occurs when either party pursuant to a power created by agreement or law puts an end to the contract otherwise than for its breach. On "termination" all obligations which are still executory on both sides are discharged but any right based on prior breach or performance survives.
>
> (d) "Cancellation" occurs when either party puts an end to the contract for breach by the other and its effect is the same as that of "termination" except that the cancelling party also retains any remedy for breach of the whole contract or any unperformed balance.

TEX. BUS. & COM. CODE § 2.106(c)-(d). The difference is whether the other party first breaches the contract. *Int'l Therapeutics, Inc. v. McGraw-Edison Co.,* 721 F.2d 488, 491–92 (5th Cir. 1983). A termination requires reasonable notice, but a cancellation does not. *Id*. at 492.

Total argues that even if it terminated, rather than cancelled, the purchase orders, it is not liable to pay for the frames not shipped, because the express language of § 2 provides a broad power to terminate on written notice, without mentioning any liability for any goods manufactured—but not shipped—before the notice. (Docket Entry No. 10 at 18). Total's argument focuses on the structure of § 2. (*Id*. at 26–27). According to Total, § 2 starts with the default rule that "all pre-delivery terminations are without liability for payment, and all post-delivery termination requires liability for payment." The second sentence states that "[a]ny conforming deliveries made prior to the effective date of such cancellation shall be controlled and governed by this Agreement," and that "Total agrees to pay . . . for such conforming deliveries in accordance with the applicable Purchase Order." (*Id*. at 27).

The parties dispute whether Total, after giving written notice of termination following months of expressing its hope and intent to resume receiving deliveries, is liable for refusing to take

15

possession of the 20 frames that Sharp manufactured after Total began reducing, then indefinitely deferring, shipment authorization. The bankruptcy court found for Total:

> In looking at the rights under the standard terms and conditions, it is very clear to me that Total had the right to terminate the agreement. And terminate has a very specific meaning versus had the right to breach the agreement. Total exercised its rights under the agreement. There was no breach. Without a breach, there can be no damages.

(Docket Entry No. 2 at 1342).

The current record does not sufficiently support this finding. For the reasons identified above, the finding does not address the fact that Total's written termination notice was preceded by months of changes to the delivery schedule. It does not address the ambiguity created by the obligation to attempt (at least) in good faith to reach mutual agreement on an adjusted time for Sharp's performance or price following Sharp's timely requests for adjustments after notice of the Changes. It does not address the ambiguity created by the absence of any purchase order language stating the consequence of a failure by Total to negotiate in good faith or the parties' failure to reach mutual agreement. Under Texas law, on termination, executory obligations on both sides are discharged, but any right based on a prior breach or performance survives. *Anadarko Petroleum*, 737 F.3d at 971; *Gulf Liquids New River Project, LLC v. Gulsby Eng'g, Inc.*, 356 S.W.3d 54, 65–66 (Tex. App.—Houston [1st Dist.] 2011, no pet.). Total's reading that it must pay for pre-termination deliveries, but need not pay for post-termination deliveries, regardless of when manufacture or tender of delivery occurred, and regardless of whether its termination notice was "reasonable," fails to account for the purchase orders' use, and the Code's definitions, of "terminate" and "cancel."

Indian Creek's amicus brief supporting Sharp also asks the court to construe the purchase orders to avoid an illusory promise. *Young v. Neatherlin*, 102 S.W.3d 415, 420 (Tex. App. 2003);

(Docket Entry No. 9 at 9). It argues that a purchase order giving Total a unilateral right to terminate without liability may be unenforceable, because the unilateral-termination clause makes Total's promise illusory. *J.M. Davidson*, 128 S.W.3d at 236. But the purchase orders required Total to give written notice before exercising its right to terminate, and Total concedes that it would be liable if it had terminated the purchase orders after receiving delivery of the frames. The purchase orders are not illusory because of these promises.[1] *See In re Halliburton*, 80 S.W.3d 566, 569–70 (an arbitration agreement was not illusory because it required a 10-day notice of any modification or termination and stated that these changes would apply prospectively).

The record shows that Total reduced, then deferred, shipment authorization for more than one year, while giving assurances to Sharp of an expectation of resuming deliveries in the near future, and without reaching an agreement with Sharp for an adjusted delivery schedule or price. The uncertainties as to whether Total attempted in good faith to agree on adjustments to the delivery schedule or price; whether Total violated its obligation to use reasonable effort to take physical possession of goods tendered for delivery before effectively changed Sharp's performance; and whether and when Total terminated the purchase orders, with what consequence, remain unresolved on this record. The bankruptcy court did not rule on these and related disputes material to determining breach and damages, and the record does not permit this court to resolve them.

## IV. Conclusion

---

[1] Although the purchase orders are not illusory because Total's unilateral right to terminate, if § 9 is interpreted to allow Total to defer all shipments indefinitely, without notice or any obligation, the contract may be unenforceable because of Total's illusory promise. To avoid that result, the court reads § 9 as requiring Total to make good-faith efforts, upon Sharp's timely request, to reach mutual agreement with Sharp for an adjusted delivery schedule or contract price.

The bankruptcy court's finding that Total did not breach the contract and owes no damages is reversed and remanded for further findings and proceedings.

SIGNED on November 27, 2018, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge