# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| CJ HOLDING CO., *et al.* | § | |
| | § | |
| Debtors. | § | |
| | § | |
| SHARP IRON GROUP, LLC, | § | |
| | § | |
| Appellant, | § | CIVIL ACTION NO. H-18-1974 |
| | § | |
| v. | § | |
| | § | |
| TOTAL E&S, INC., | § | |
| | § | |
| Appellee. | § | |

## ORDER

In November 2018, the court issued a Memorandum Opinion and Order remanding to the bankruptcy court. The appeal was from that court's order denying Sharp Iron Group's breach-of-contract claim against Total E&S, Inc. (Docket Entry No. 12). Sharp has moved for rehearing of this court's Memorandum Opinion and Order, and Total has responded. (Docket Entry Nos. 17, 18). The motion for rehearing is denied, and the November Memorandum Opinion and Order is clarified as set out below.

**I.     Background**

The Memorandum Opinion and Order addressed: (1) whether Total breached the parties' purchase orders by refusing to take possession of, or pay for, the frames that Sharp manufactured and tendered for delivery before Total's written termination notice; and (2) if Total did breach,

whether it was nevertheless not liable and owed no damages because the purchase orders gave Total the unilateral right to terminate at any time.

The court found genuine factual disputes material to deciding whether Total exercised, in good faith, its contract right to modify the delivery schedule, and whether Total gave Sharp proper notice before the modification. Although the parties agreed that the purchase orders had been terminated by January 18, 2016, they disputed the termination date. The court remanded to the bankruptcy court for additional fact finding.

As to Total's liability in the event of breach, the relevant section of the purchase orders stated:

> **§ 2 Termination or Modification**. Total may, at its option, *terminate* this Agreement and any Purchase Order, in whole or in part, upon providing *written notice* to Seller. Any conforming deliveries made prior to the effective date of *such cancellation* shall be controlled and governed by this Agreement. Total agrees to pay Seller for such conforming deliveries in accordance with the applicable Purchase Order. In the event, however, that Seller is in breach of any of the terms thereof, including the warranties of the Seller, or in the event that Seller so fails to make progress so as to endanger performance by Seller of the Purchase Order in accordance with its terms or the performance by Total of any order or contract with any other party, Total shall be entitled to *cancel* Purchase Order *without liability*.

(Docket Entry No. 10 at 13–14) (emphasis added).

The parties dispute whether the purchase orders used "terminate" and "cancel" interchangeably. According to Sharp, "terminate" and "cancel" have different meanings in the purchase orders. (Docket Entry No. 6 at 27; Docket Entry No. 17). The last sentence of § 2 states that Total had the right to *cancel* a purchase order if Sharp breached, without liability, while the first sentence states that Total had the right to *terminate* a purchase order only after providing Sharp with written notice. Under § 2, Total could end the purchase orders without liability for manufactured-

but-undelivered frames only if Total "cancelled" based on Sharp's breach. If Total unilaterally "terminated," rather than "cancelled," a purchase order, without Sharp's prior breach, Total would remain liable to pay at least for the frames Sharp had manufactured and tendered for delivery before the termination. (Docket Entry No. 6 at 27).

Sharp also cites to the Texas Business and Commerce Code § 2.106, which defines the words:

> (c) "Termination" occurs when either party pursuant to a power created by agreement or law puts an end to the contract otherwise than for its breach. On "termination" all obligations which are still executory on both sides are discharged but any right based on prior breach or performance survives.
>
> (d) "Cancellation" occurs when either party puts an end to the contract for breach by the other and its effect is the same as that of "termination" except that the cancelling party also retains any remedy for breach of the whole contract or any unperformed balance.

TEX. BUS. & COM. CODE § 2.106(c)–(d). Prior "[b]reach, or the absence thereof, is the essential difference" between termination and cancellation. *Int'l Therapeutics, Inc. v. McGraw-Edison Co.*, 721 F.2d 488, 492 (5th Cir. 1983).

The November Memorandum Opinion and Order agreed with Sharp, finding:

Under Texas law, on termination, executory obligations on both sides are discharged, but any right based on a prior breach or performance survives. *Anadarko Petroleum*, 737 F.3d at 966, 971 (5th Cir. 2013); *Gulf Liquids New River Project, LLC v. Gulsby Eng'g, Inc.*, 356 S.W.3d 54, 65–66 (Tex. App.—Houston [1st Dist.] 2011, no pet.). Total's reading that it must pay for pre-termination deliveries, but need not pay for post-termination deliveries, regardless of when manufacture or tender of delivery occurred, and regardless of whether its termination notice was "reasonable," fails to account for the purchase orders' use, and the [Texas Business and Commerce] Code's definitions of "terminate," and "cancel."

(Docket Entry No. 12). Sharp argues that the court's Memorandum Opinion and Order was unclear and moves for rehearing, clarifying the interpretation of "termination" and "cancellation" in the

3

purchase orders.

Responding to Sharp's motion, Total asks the court to revisit the issues and to find that the purchase orders expressed the parties' intent to use "termination" and "cancellation" interchangeably, giving Total the right to end the purchase orders without liability, regardless of whether Sharp had a prior breach. (Docket Entry No. 18). Total points to the first and second sentences of § 2, stating that "Total may . . . *terminate* this Agreement and any Purchase Order. . . . Any conforming deliveries made prior to the effective date of *such cancellation* shall be controlled and governed by this Agreement." (*Id.*). Total contends that because the first sentence gave it the right to "terminate" the purchase order and the second sentence referred back to "terminate" as "such cancellation," the parties did not intend "termination" and "cancellation" to have different meanings. Total contends that parties may define contract terms to have meanings different than the Texas Business and Commerce Code definitions, and that the court cannot rewrite the parties' terms. Evidence such as trade usage is "admissible to explain, supplement, or qualify an agreement, but it may not be used to contradict an express term." *Transcontinental Gas Pipeline Corp. v. Texaco, Inc.*, 35 S.W.3d 658, 670 (Tex. App. —Houston [1st Dist.] 2000, pet. denied).

## II.     Analysis

The Federal Rules of Civil Procedure do not specifically provide for motions for reconsideration. *St. Paul Mercury Ins. Co. v. Fair Grounds Corp.*, 123 F. 3d 336, 339 (5th Cir. 1997). A motion asking the court to change an order or judgment is generally considered a motion to alter or amend under Rule 59(e). *eTool Dev. Inc. v. Nat'l Semiconductor Corp.*, 881 F. Supp. 2d 745, 748–49 (E.D. Tex. 2012).

A Rule 59 motion "must clearly establish either a manifest error of law or fact or must

4

present newly discovered evidence and cannot be used to raise arguments which could, and should, have been made before the judgment issued." *Rosenzweig v. Azurix Corp.*, 332 F. 3d 854, 863–64 (5th Cir. 2003) (quotation omitted). Changing an order or judgment under Rule 59(e) is an "extraordinary remedy" that courts use sparingly. *Templet*, 367 F.3d at 479; *see also* 11 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 2810.1 at 124 (2d ed. 1995). The Rule 59(e) standard "favors denial of motions to alter or amend a judgment." *S. Constructors Grp., Inc. v. Dynalectric Co.*, 2 F.3d 606, 611 (5th Cir. 1993). A motion to reconsider may not be used to relitigate matters, raise arguments, or submit evidence that could have been presented before the judgment or order was entered. 11 WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 2810.1 at 127–28 (footnotes omitted).

Under Texas law, the primary concern for a court construing a written contract is to "ascertain the true intentions of the parties as expressed in the writing itself." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011); *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). To identify the intent, the court must "examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *J.M. Davidson*, 128 S.W. 3d at 229. "If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). If the contract is subject to more than one reasonable interpretation, the contract is ambiguous, creating a fact issue on the parties' intent. *J.M. Davidson*, 128 S.W.3d at 229. "Only where a contract is ambiguous may a court consider the parties' interpretation and admit extraneous evidence to determine the true meaning of the

instrument." *David Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450–51 (Tex. 2008).

The purchase orders did not define "termination" and "cancellation." Total is correct that the cross-reference in the first and second sentences of § 2 could show that the parties did not intend to distinguish between these two terms. But even if "cancellation" and "termination" are used interchangeably in the purchase orders, only the last sentence of § 2 discussed when Total could end the purchase orders without liability. This sentence stated that Total would not be liable for ending a purchase order if Sharp had breached, including by breaching the warranties or endangering Total's performance to a third party. Although the first sentence of § 2 gave Total the right to end a purchase order unilaterally regardless of whether Sharp had breached, Total had to give Sharp written notice before doing so. (Docket Entry No. 10 at 13–14) ("Total may, at its option, *terminate* this Agreement and any Purchase Order, in whole or in part, upon providing *written notice* to Seller."). The purchaser orders did not state that once Total ended the purchase order, Total would not be liable for a breach that occurred before it gave Sharp written notice of termination.

If the bankruptcy court finds that, before giving Sharp written notice of termination, Total did not modify the delivery schedule in good faith, or that Total improperly refused to take delivery of tendered conforming frames, Total could be liable for breach even if it later gave notice and terminated the purchase order. This interpretation is consistent with the third sentence of § 2, which required Total to pay for all conforming deliveries made before it properly exercised the right to unilaterally end the purchase orders.

Sharp also asks the court to clarify that it had manufactured at least 37 frames before Total sent the written termination notice in January 2016. The November Memorandum Opinion and Order stated that Sharp had completed and tendered for delivery "20 frames . . . before Total's

6

written termination notice." (Docket Entry No. 12, at 6). According to the record, Sharp's president, James Frank, testified that by August 2015, Sharp had finished 20 frames that were ready to deliver. (Docket Entry No. 2, at 1310). Sharp's CEO and owner, Michael Stanford, testified that by January 2016, Sharp had completed 37 frames. (*Id.* at 1298). If the bankruptcy court finds that Total breached before giving Sharp written termination notice, the bankruptcy court should also decide how many frames Sharp had completed and tendered for delivery before the termination notice, and whether Sharp took actions, such as stopping production work after the termination, to mitigate damages.

These factual disputes cannot be properly resolved on appeal. Total's motion for rehearing is denied, with the clarifications noted.

SIGNED on February 5, 2019, at Houston, Texas.

                                      Lee H. Rosenthal
                              Chief United States District Judge